**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARC D. PEVAR,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **BOROUGH OF KENNETT** | : | |
| **SQUARE, et al.,** | : | **NO. 09-1758** |
| **Defendants.** | : | |

**M E M O R A N D U M**

**GENE E.K. PRATTER, J.,**                                      **MAY 17, 2012**

## I.      INTRODUCTION

Plaintiff Marc Pevar, an outspoken critic of the local government in the Borough of Kennett Square, Pennsylvania, applied for a permit to build townhouses on a sloping parcel of land in the Borough. However, because the Borough's municipal zoning ordinances prohibit building on lands with steep slopes, the Borough denied Mr. Pevar permission to build his townhouses and declined to make an exception from the ordinance for Mr. Pevar. Dissatisfied with the Borough's decisions, Mr. Pevar filed a complaint alleging that the Borough and two of its officials, Marc Jonas and Rusty Drumheller, rejected his applications in retaliation for his extensive political activities in violation of the First Amendment and targeted him as a "class of one" for disparate treatment in violation of the Equal Protection Clause.

The Borough, Mr. Jonas, and Mr. Drumheller moved for summary judgment. For the reasons that follow, the Court grants the Defendants' motion.

1

II.     **FACTUAL BACKGROUND**

Mr. Pevar is the president of the Pevar Company, a general contracting corporation, and a resident of the Borough of Kennett Square, Pennsylvania.  Borough Stmt. Facts ¶¶ 1-2.  Mr. Pevar has been a "community activist" in the Borough since approximately 1996.  Id. ¶ 3. Among his community activism, in about 1997, Mr. Pevar belonged to a group that challenged the Borough for an alleged lack of enforcement of ordinances, including the ordinance regulating how many families could live in a single-family residence.  Id. ¶ 4.  In approximately 1998 or 1999, Mr. Pevar also challenged the Borough's addition of a tax to its residents' sewer and water bills.  Id. ¶ 5.  In the 1999 to 2000 time frame, Mr. Pevar objected to the Borough's efforts to oppose the expansion of St. Patrick's Church, taking particular exception to the legal expenses incurred by the town for what Mr. Pevar viewed as a "losing battle."  Pevar Dep. at 34-35.  Mr. Pevar also petitioned the Borough regarding its use of public funds to purchase land for a spray irrigation system without first "perking" the land.  Borough Stmt. Facts ¶ 6.  In addition to his activism, Mr. Pevar had served in local government.  In 1999 or 2000, Mr. Pevar was appointed to the Planning Commission of the Borough and served on the Commission until approximately 2008.  Id. ¶ 7.

On February 14, 2006, Mr. Pevar entered into an agreement to purchase a property located at 126 South Walnut Street in the Borough (the "Property").  Id. ¶ 8.  Attached to that agreement was an addendum providing that the agreement of sale was contingent on the Borough Council granting final approval for Mr. Pevar to build a five-unit townhouse subdivision.  Id. ¶ 9. Paragraph 11 of the addendum acknowledges the existence of steep slopes on the Property.  Id. ¶ 10; Borough Ex. B ¶ 11.

2

Mr. Pevar was concerned that the slopes could pose an issue to his development because Section 23-48(e)(2)(B) of the Borough's zoning ordinance expressly prohibits building on sites that include pre-existing slopes of 25% or greater, and Section 23-48(e)(1) prohibits building townhouses on areas with pre-existing slopes of 15% or greater.  Borough Stmt. Facts ¶¶ 15-16a; Borough Ex. D.  Thus, in anticipation of filing a zoning permit application for the Property with the Borough, in March 2006 Mr. Pevar met with the Borough Zoning Officer, Mr. Drumheller, and the Borough Manager, Marge Wolf to get assurances that "there was not going to be an issue around the slopes."  Id. ¶ 11.

Additionally, on April 5, 2006, Mr. Pevar forwarded a letter to the Borough ahead of a scheduled meeting regarding his application.  Id. ¶ 12.  This letter included a photocopy of a topographical survey originally prepared for the adjoining property, and acknowledged, "If I use minimal front yard setback, then only one small corner of the townhouse building sits on steep slopes.  If I set back 54' for a front parking lot like Berlin, next door, then the entire building is in steep slopes."  Borough Ex. C.  Likewise, the drawings attached to Mr. Pevar's April 5, 2006 letter depict slopes on the Property of 25-30%.  Id.

Two days later, on April 7, 2006, Mr. Pevar submitted both his Zoning Permit and Land Development Application ("Permit Application") to the Borough and an Application to the Kennett Square Borough Zoning Hearing Board for Special Exception or Variance ("Variance Application").  Borough Stmt. Facts ¶ 16b.  As a supplement to his Permit Application, on April 7, 2006 Mr. Pevar submitted a second letter to the Borough attaching revised drawings.  Pevar Supp. Ex. 36.  The revised drawings show slopes of 29.2%, 25.6%, 18.6%, and 17.5% on the Property.  Id.  In the letter, however, Mr. Pevar suggested that these slopes were not "steep

3

slopes" under the ordinance because they were not "pre-existing" slopes.[1]  Id.  However, because

the term "pre-existing" is not defined in the zoning ordinance, Mr. Pevar acknowledged in his

April 7, 2006 letter, "it appears that Rusty [Drumheller] has the authority to interpret what 'pre-

existing' means."  Id.

        In his Variance Application to the Zoning Hearing Board, Mr. Pevar requested "the right

to build the otherwise permitted 5-townhouse building, the steep slopes notwithstanding."

Borough Stmt. Facts ¶ 17.  Defendants note that Mr. Pevar testified he filed this Variance

Application because his calculations showed that there were slopes on the Property that exceeded

the 15% allowed for the construction of townhouses.  Id. ¶ 18.  Mr. Pevar, however, disputes any

contention that his inexpert calculations constitute an admission because he is not qualified to

make conclusions about slopes, and explains that he probably calculated the slopes in a manner

that does not conform to the calculation method described in the zoning ordinance.  In addition,

Mr. Pevar contends that his Variance Application was contingent upon a finding of steep slopes

by Mr. Drumheller, and that he only filed the Variance Application as a precaution, not as an

admission.

        On April 10, 2006, Mr. Drumheller denied Mr. Pevar's Permit Application because the

drawings Mr. Pevar submitted with his April 7, 2006 letter showed building in areas of steep

slopes in violation of the zoning ordinance.  Id. ¶ 19.  In a letter dated the same day, Mr.

Drumheller advised Mr. Pevar of his decision and explained that Mr. Pevar had a right to appeal

to the Zoning Hearing Board.  Id. ¶ 20.  Mr. Pevar did not file an appeal of Mr. Drumheller's

---

[1]        Mr. Pevar claims that the slopes on the Property are largely the result of a road-excavation project that occurred at some point in the past, where the removed dirt caused the presently "existing" slopes on the Property, but the slopes on the property "pre-existing" this activity were not as dramatic.

determination.  Id. ¶ 21.  Nevertheless, on May 10, 2006, Mr. Pevar wrote to Mr. Drumheller

claiming for the first time that the Property did not have steep slopes based upon a new way of

calculating the degree of slope, and reiterating his interpretation of the term "pre-existing" as it

applied to the slopes.  Id. ¶ 22.  In this letter, Mr. Pevar asked Mr. Drumheller for his opinion on

these issues.  Id. ¶ 23.  Mr. Drumheller responded on the same day to the May 10, 2006

correspondence with a letter, reiterating his conclusion that the submitted drawings depicted

construction on steep slopes in violation of the zoning ordinance.  Id. ¶ 24; Borough Ex. I.   Mr.

Pevar took no action on this determination other than to continue with his Variance Application

before the Zoning Hearing Board.  Borough Stmt. Facts ¶ 25.

By letter dated May 16, 2006, the Borough Planning Commission recommended that the

Zoning Hearing Board uphold the Zoning Ordinance and deny Mr. Pevar's Variance Application.

Id. ¶ 26.  The Planning Commission explained that "this ordinance is very important in keeping

soil and erosion at a minimum and for the protection of properties within the borough."  Borough

Ex. J.  The Zoning Hearing Board held hearings on Mr. Pevar's Variance Application on May 23,

2006 and July 31, 2006.   Borough Stmt. Facts ¶ 27.  Defendant Marc Jonas, the Borough

Solicitor, represented the Borough at the hearings.  Id. ¶ 28.   On August 22, 2006, the Zoning

Hearing Board denied Mr. Pevar's Variance Application, noting that the zoning ordinance

mandated denial when applied to Mr. Pevar's Property.  Id. ¶ 33.

While the Zoning Hearing Board matter was pending, Mr. Pevar wrote a letter to each of

the Borough Council members complaining about Mr. Jonas' conduct at the Zoning Hearing

Board hearings, and advising the Council members of their duty to follow the zoning ordinance.

Id. ¶ 29.  Instead of mailing the letter to the Council members, Mr. Pevar intended to have the

letter read aloud during the public comment portion of the August 7, 2006 Borough Council meeting.  Although Mr. Pevar could not attend the meeting due to a conflict,[2] Mr. Pevar's wife went in his stead to read the letter on his behalf.  Id. ¶ 30; Pevar Dep. at 119.  However, when Mrs. Pevar began to read the letter, the Council interrupted her and did not allow her to continue.  Id. ¶ 31.  Borough Council President Jeffrey Darman explained to her that because the letter "pertains to an application before the Zoning Hearing Board," and the Municipal Code specifies that the "Borough Council cannot discuss nor take any action pertaining to an application that is pending before the Zoning Hearing Board," it was inappropriate to have the letter read aloud at the meeting.  Pevar Ex. 2.  Nevertheless, Mr. Pevar's letter was incorporated into the official minutes of the meeting, and Mrs. Pevar handed a copy of the letter to each Council member.  Id**.**

---

[2]        At oral argument, the Court permitted the parties an additional opportunity to cite to record evidence in support of their respective positions.  The Court made clear, however, that it would not permit the parties to "go out and start taking new depositions that haven't been taken . . . [or] interviewing witnesses that haven't been questioned, or . . . writing up new reports . . . . If it's something that has happened in the record of this case so far, please go find it."  Tr. at 54.

However, in his supplemental submissions, Mr. Pevar attempted to introduce an affidavit dated April 11, 2011 (three days *after* the oral argument), in which he alleges for the first time that he did not attend the Borough Council meeting because he was told by an unnamed Borough official that he would not be permitted to speak or address the Council in the public comment portion of the meeting.  See Pevar Supp. Ex. 1.  He also claims that this same unnamed Borough official told him that neither Mr. Drumheller nor any Borough Council members or employees were allowed to review or discuss the report of Mr. Pevar's engineer with him.  Id.  Mr. Pevar's affidavit is precisely the type of new evidence the Court plainly stated it would not consider as a supplement to the parties' summary judgment papers.

Regardless, reliance on "conclusory, self-serving affidavits [is] insufficient to withstand a motion for summary judgment."  Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009) (quoting Blair v. Scott Specialty Gases, 283 F.3d 595, 608 (3d Cir. 2002)).  "Instead, the affiant must set forth specific facts that reveal a genuine issue of material fact."  Id.  In this circumstance, the record is clear from Mr. Pevar's own deposition testimony that he did not attend the meeting because he had a conflict; not because of any disingenuous actions on the part of an anonymous Borough official.  See Pevar dep. at 119 (Q: "Were you present at the meeting?"  A: "No."  Q: "Why not?"  A: "I had a conflict.  I don't recall why, what it was.  But I am involved in other things and there was some reason why I couldn't be there.").  Accordingly, the Court will not consider the post-argument affidavit.

To bolster his equal protection claim, Mr. Pevar asserts that the Borough allowed the development of townhouses on two other properties in the Borough that are similar to the Property at 126 South Walnut Street.  Id. ¶¶ 34-35, 38.  One such property is located adjacent to the Property, and can be seen in the drawing Mr. Pevar submitted to the Borough on April 5, 2006.  Id. ¶ 35.  This adjoining property has steep slopes on only a small part of the land.  Id. ¶ 36.  Mr. Pevar admits that if the slopes occupy only a small part of the property, they are regarded as *de minimus*, and building on such slopes is permitted under the ordinance.  Id. ¶ 37.  The other allegedly similar property is located on Mulberry Street in the Borough.  Id. ¶ 38.  Townhouses were approved for the Mulberry Street property in August 2000, six years before Mr. Pevar made his applications, and one year before the Borough hired Mr. Drumheller as its Zoning Officer.  Id. ¶¶ 39-40.

The Defendants contend that Mr. Drumheller based his denial of Mr. Pevar's Permit Application on Section 23-48 of the zoning ordinance and the fact that the Permit Application and accompanying papers state that the Property has slopes of 29.2%, 18.57% and 17.5%.  Mr. Pevar disputes this, and offers the testimony of his expert witness, Tom Comitta, who opines that Mr. Drumheller's conclusion was inaccurate and not based upon objective or quantitative measurement as required by the ordinance.  The Defendants have not responded to this expert opinion, and Mr. Pevar asserts—without any evidentiary support—that Mr. Jonas directed Mr. Drumheller not to read, review, or respond to the expert findings.

Mr. Pevar has had other development projects approved in the Borough both before and since the denial of his applications for the Property that are the subject of this case.  Id. ¶ 42.

7

### III.    LEGAL STANDARD

Upon motion of a party, summary judgment is appropriate if, "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . .  admissions, interrogatory answers, or other materials," the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." FED. R. CIV. P. 56(c); Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).  An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if its resolution could affect the result of the suit under governing law.  Id.

In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.  Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 217, 322 (1986); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987). The party opposing summary judgment must support each essential element of that party's opposition by "citing to particular parts of materials in the record."  FED R. CIV. P. 56(c)(1).

"The Court need consider only the cited materials" when determining whether there exists a genuine issue of material fact for trial.  FED R. CIV. P. 56(c)(3).  If the cited evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).  This requirement upholds the "underlying

purpose of summary judgment [which] is to avoid a pointless trial in cases where it is

unnecessary and would only cause delay and expense." Walden v. Saint Gobain Corp., 323 F.

Supp. 2d 637, 641 (E.D. Pa. 2004) (citing Goodman v. Mead Johnson & Co., 534 F.2d 566, 573

(3d Cir. 1976)).

## IV.   SECTION 1983 STANDARDS

### A.  Section 1983

The federal civil rights statute, 42 U.S.C. § 1983, authorizes a cause of action for those

who challenge a state or municipality's "deprivation of any rights . . . secured by the

Constitution."  Section 1983 was enacted during post-Civil War Reconstruction, and was

designed "to interpose the federal courts between the states and the people, as guardians of the

people's federal rights. . . ." Mitchum v. Foster, 407 U.S. 225, 242 (1972).  It is not itself a

source of substantive rights, "but a method for vindicating federal rights elsewhere

conferred. . . ." Baker v. McCollan, 443 U.S. 137, 145 n.3 (1979); Neumeyer v. Beard, 421 F.3d

210, 213 (3d Cir. 2005).

In order to make out a prima facie case against an individual under § 1983, a plaintiff

must show (1) that the defendant deprived him or her of a federal right; and (2) that in doing so,

the defendant was acting under color of state or territorial law.  Edwards v. City of Philadelphia,

860 F.2d 568, 573 (3d Cir. 1988) (citing Gomez v. Toledo, 446 U.S. 635, 640 (1980)).  Where,

as here, there are multiple defendants, the plaintiff must establish that each defendant personally

participated, directed, or knowingly acquiesced in each of the alleged constitutional violations.

See C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005); C.H. ex rel. Z.H. v.

Oliva, 226 F.3d 198, 201 (3d Cir. 2000) (en banc) ("It is, of course, well established that a

defendant in a civil rights case cannot be held responsible for a constitutional violation which he

or she neither participated in nor approved.").

### B.  Qualified Immunity

Even where a plaintiff has made out a *prima facie* case that a government official violated

a federal right while acting under color of state law, the official may still avoid liability on

account of the doctrine of qualified immunity.  Under the defense of qualified immunity,

"[g]overnment officials performing discretionary functions are 'shielded from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.'"  Sharrar v. Felsing, 128 F.3d 810, 826

(3d Cir. 1997), abrogated on other grounds by, Curley v. Klem, 499 F.3d 199 (3d Cir. 2007)

(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

The Supreme Court has established a two-step test for determining whether an official's

actions may be shielded from liability under the doctrine of qualified immunity.  Saucier v. Katz,

533 U.S. 194, 201 (2001), overruled in part by, Pearson v. Callahan, 555 U.S. 223, 227 (2009)

(holding that the Saucier test should not be regarded as an inflexible requirement ).  First, the

Court must consider whether an official's actions violated a constitutional right.  The analysis

need not go further if the government official's conduct did not violate a constitutional right.  Id.

at 201.   The plaintiff bears the initial burden of proof on the question of whether a constitutional

violation occurred.  See Open Inns, Ltd. v. Chester Cty. Sheriff's Dep't., 24 F. Supp. 2d 410, 419

(E.D. Pa. 1998) (citing Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997).

However, if an official's conduct did violate a constitutional right, the Court must then determine whether the constitutional right at issue was clearly established.  Saucier, 533 U.S. at 201-202.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted."  Id. at 202; Williams v. Bitner, 455 F.3d 186, 191 (3d Cir. 2006).  Thus, this inquiry "must be undertaken in light of the specific context of the case."  Saucier, 533 U.S. at 202.  Qualified immunity is an affirmative defense, and an officer asserting it therefore bears the burden of proving its applicability to his or her case.  Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004).

### C.  Monell

A local government "may not be sued under § 1983 for an injury [that has been] inflicted solely by its employees or agents."  Brown v. Pittsburgh, 586 F.3d 263, 292 (3d Cir. 2009) (quoting Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978)).  "In other words, a plaintiff cannot rely upon a theory of respondeat superior to impose § 1983 liability upon a municipality."  Id.

"Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  Id.  Thus, the analysis of Monell claims focuses on whether the policy or custom was actually the "moving force" behind any constitutional violations that may have been perpetrated by a municipality's

employees.  Canton v. Harris, 489 U.S. 378, 389 (1989) (citing Polk Cty. v. Dodson, 454 U.S. 312, 326 (1981); Pembaur v. Cincinnati, 475 U.S. 469, 483-484 (1986)).

A policy is made "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." Kneipp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996) (quoting Pembaur, 475 U.S. at 481).  A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 404 (1997).  In addition to establishing the existence of a policy or custom, a plaintiff must establish a causal connection between the policy or custom and the injury suffered.  See Talbert v. Kelly, 799 F.2d 62, 67 (3d Cir. 1986).

## V.   DISCUSSION

Mr. Pevar contends that the Defendants violated his First Amendment and Equal Protection rights when they (1) denied his wife the opportunity to read a letter on his behalf at the August 7, 2006 Borough Council meeting, (2) denied his zoning applications in retaliation for his political activism, and (3) treated his zoning applications differently than other similarly situated individuals in the town.  The Individual Defendants move for summary judgment on the grounds that they did not violate Mr. Pevar's constitutional rights, and even if they somehow did violate his rights, they are entitled to qualified immunity.  The Borough moves for summary judgment because Mr. Pevar is unable to adduce any evidence of a custom, policy, or practice such that the Borough could be held liable under Monell for the alleged constitutional violations.

The Court will address each of these purported constitutional violations in turn.

### A.  First Amendment Claim Against Individual Defendants

Mr. Pevar asserts that Messrs. Drumheller and Jonas violated his First Amendment rights when the Borough Council did not permit his wife to read his letter at the August 7, 2006 Borough Council meeting.

For Mr. Pevar to succeed on this claim against the Individual Defendants under § 1983, he must demonstrate that each Individual Defendant acted under color of law, and while so acting, deprived him of his First Amendment right to free speech and petition the government. See Galena v. Leone, 638 F.3d 186, 197-98 (3d Cir. 2011) (citing Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 281 (3d Cir. 2004) (treating claims under the speech and petition clauses under the same standard)).  Indeed, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs."  Solan v. Ranck, 326 F. App'x 97, 100-01 (3d Cir. 2009) (citing Rode, 845 F.2d at 1207); Ridgewood, 430 F.3d at 173.

As it pertains to the Individual Defendants, the Court need not analyze whether Mr. Pevar's First Amendment rights were violated because he is unable to prove as a matter of law that either of the Individual Defendants took any action, let alone an action under color of law, to deprive him of his First Amendment rights.  Neither Mr. Drumheller nor Mr. Jonas was a member of the Borough Council.  Likewise, the record lacks any evidence, aside from Mr. Pevar's bare allegations,[3] that suggests either Mr. Drumheller or Mr. Jonas had any hand in the

---

[3]     Indeed, in his supplemental response, Mr. Pevar reiterated his allegation that he did not address the Borough Council meeting on August 7, 2006 "because Defendant Jonas instructed members of Borough Council to refuse to allow Pevar, to personally, [sic] to address Council or to interact with Council regarding his application for the Property, under the guise that such action was contrary to the Municipalities['] Planning Code . . . ."  In support of this allegation, which in his complaint was pled upon information and belief, Mr. Pevar cites only to his own affidavit.  However, even if the Court were to consider this affidavit, it only refers to an unnamed Borough official, not Mr. Jonas specifically.

Borough Council's decision not to let Mrs. Pevar read her husband's letter at the meeting.  If, indeed, any Borough official's conduct violated Mr. Pevar's First Amendment right to free speech as it pertains to the August 7, 2006 Borough Council meeting, the Court concludes that no reasonable jury could find that either of the Individual Defendants did so.  Accordingly, the Court must dismiss this claim as it pertains to Messrs. Drumheller and Jonas.

### B.  First Amendment Retaliation Against Individual Defendants

The Court next turns to Mr. Pevar's claim that his zoning applications were denied in retaliation for his criticism of the Borough and its officials.  Both Messrs. Drumheller and Jonas assert that they are entitled to qualified immunity on this claim.  As an initial matter, the Court again notes that Mr. Pevar must establish that each of the Individual Defendants acted under color of state law in order to commit violations of Mr. Pevar's First Amendment rights.  42 U.S.C. § 1983; see also Ridgewood, 430 F.3d at 173.  Here, the only retaliatory actions Mr. Pevar alleges relate to Mr. Drumheller's denial of his Permit Application, and the Zoning Hearing Board's denial of his Variance Application.

There is no dispute between the parties that Mr. Drumheller was the individual who denied Mr. Pevar's Permit Application.  However, Mr. Pevar also alleges that Mr. Drumheller acted at the direction of Mr. Jonas.  In his brief in opposition to the Defendants' motion for summary judgment, Mr. Pevar, in conclusory fashion, argues that Mr. Jonas (1) "supported Defendant Drumheller's decision" to deny his Permit Application, and (2) "directed Defendant Drumheller to not read, review or respond to [Mr. Pevar's] expert findings . . . ."  Pevar Opp. at 8-9.  Mr. Pevar, however, fails to cite to or attach any record evidence that supports these

14

allegations.  Accordingly, even viewing the record evidence in the light most favorable to Mr.

Pevar, the Court concludes that no reasonable jury could find that Mr. Jonas either directed Mr.

Drumheller to deny Mr. Pevar's Permit Application or actionably supported Mr. Drumheller in

his decision to deny the Permit Application.

Likewise, the parties do not dispute that Mr. Pevar's Variance Application was denied by

the Zoning Hearing Board and that Mr. Jonas represented the Borough at the hearings in

opposition to Mr. Pevar's Variance Application.  However, Mr. Pevar has not presented any

record evidence that suggests either Mr. Drumheller or Mr. Jonas participated in the Zoning

Hearing Board's decision to deny the Variance Application.  Neither Mr. Jonas nor Mr.

Drumheller served on the Zoning Hearing Board, neither had any say in the Board's ultimate

decision, and the record evidence does not suggest that either individual exercised any undue

influence over the Zoning Hearing Board's decision.  The evidence merely shows that both

individual defendants performed their jobs as Borough officials – jobs that did not carry the

authority to determine the outcome of the Zoning Hearing Board's decision.  Accordingly, based

on the evidence presented, no reasonable jury could conclude that Mr. Jonas or Mr. Drumheller

participated in the Zoning Hearing Board's decision to deny the Variance Application.

Having established for the purposes of this motion that Mr. Drumheller's denial of Mr.

Pevar's Permit Application was the only action under color of law taken against Mr. Pevar by

either of the Individual Defendants, the Court must now determine whether Mr. Drumheller is

entitled to qualified immunity.  As noted above, qualified immunity shields an official from suit

if he could have reasonably believed that the actions in question were lawful in light of clearly

established law and the information the official possessed at the time.  Hunter v. Bryant, 502 U.S.

224, 227 (1991) (per curiam); <u>Sharrar</u>, 128 F.3d at 826.  "In the context of a First Amendment retaliation claim, that determination turns on an inquiry into whether officials reasonably could believe that their motivations were proper even when their motivations were in fact retaliatory."  <u>Larsen v. Senate of Commonwealth of Pa.</u>, 154 F.3d 82, 94 (3d Cir. 1998).  Thus, if "the legitimate basis for the [defendants'] actions [is] so apparent" that they "would have been compelled to reach the same decision even without regard for the protected First Amendment activity," the defendants may can have a claim for qualified immunity.  <u>Id</u>. at 95.

In this case, the record is clear that Mr. Drumheller's decision to deny Mr. Pevar's Permit Application would have been the same without regard to Mr. Pevar's avowed political activism.  Mr. Pevar acknowledged on the face of his Permit Application and supporting documents the existence of slopes on his property of 15% or greater.  Borough Stmt. Facts ¶ 16b; Pevar Supp. Ex. 36.  Likewise, Mr. Pevar's Variance Application filed the same day as his Permit Application requested permission to build his townhouses "steep slopes notwithstanding."  Borough Stmt. Facts ¶¶ 16b, 17; Borough Ex. F.  The Borough's zoning ordinance does not permit building on slopes of 25% or greater and only permits single-family homes, government or public recreation uses or incidental accessory uses on slopes of 15% or greater.  Borough Ex. D.

Although Mr. Pevar argues vehemently that the slopes on his Property were man-made and consequently, not "pre-existing," that is of no material matter.  The zoning ordinance does not distinguish between man-made and non-man-made slopes, and the term "pre-existing" is not a defined term in the ordinance.  <u>Id</u>.  Mr. Drumheller's interpretation of the ordinance was facially reasonable and, as Mr. Pevar recognized in his April 7, 2006 letter to the Borough, within

16

his discretion to interpret.  Pevar Supp. Ex. 36.  Mr. Pevar's allegations of retaliatory motive are insufficient to defeat Mr. Drumheller's qualified immunity.[4]

Accordingly, having established that Mr. Pevar has failed to present any evidence establishing that Mr. Jonas played a role in the purported violations of his First Amendment rights, and that Mr. Drumheller is entitled to qualified immunity, the Court concludes that no reasonable jury could find that Mr. Drumheller and Mr. Jonas retaliated against Mr. Pevar for having exercised his First Amendment rights.

---

[4]    Even assuming Mr. Drumheller was not entitled to qualified immunity on the First Amendment retaliation claim, Mr. Pevar's claim would fail because he has not presented sufficient record evidence to establish a causal link between his political activism and the decision to deny his Permit Application.  See generally Schlegel v. Koteski, 307 F. App'x 657, 661 (3d Cir. 2009).  To establish a claim of First Amendment retaliation, Mr. Pevar must put forth record evidence establishing a triable issue of fact that (1) the activity in question was protected by the First Amendment, (2) he suffered an adverse action, and (3) there was a causal link between his constitutionally protected conduct and the retaliatory action.  Bush v. Adams, No. 07-4936, 2011 WL 1899449, at *7-8 (E.D. Pa. May 19, 2011) (citing Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006); Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (noting causation can be shown by (1) "unusually suggestive temporal proximity between the protected activity and the retaliatory action," (2) "a pattern of antagonism coupled with timing to establish a causal link," or (3) the "evidence gleaned from the record as a whole" suggests a causal connection).

First, based on the record evidence, Mr. Pevar's most recent political activity occurred in October 2005, almost six months before Mr. Drumheller denied the application.  Second, Mr. Pevar has failed to put forth any evidence of a pattern of antagonistic conduct against him subsequent to his protected conduct.  Indeed, each of Mr. Pevar's other development projects (both before and since the denial of his applications for this Property) have been approved by the Borough.  In other words, the record as a whole lacks evidence suggesting causation.  Accordingly, assuming Mr. Drumheller is not entitled to qualified immunity—a conclusion the Court does not reach—Mr. Pevar's claim would nonetheless fail because he is unable to establish a causal connection between his protected activity and the decision to deny his application.

### C. Equal Protection Against Individual Defendants

Mr. Pevar next asserts that Messrs. Drumheller and Jonas violated his right to equal protection under the law because they treated him differently than other similarly situated individuals in the town when they denied his zoning applications.[5]  Mr. Pevar does not allege that he is a member of a protected class, ordinarily a prerequisite to asserting an equal protection claim.  Rather, Mr. Pevar asserts that he is "class of one."  See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

To succeed on an equal protection claim under a "class of one" theory, Mr. Pevar must demonstrate that (1) the Defendants treated him differently from others similarly situated, (2) the defendants did so intentionally, and (3) there was no rational basis for the difference in treatment. Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006) (citing Village of Willowbrook, 528 U.S. at 564).  Such a "class of one" can attack intentionally different treatment if it is "irrational and wholly arbitrary."  Eichenlaub, 385 F.3d at 286; Sheddy Family Trust ex rel. Sheddy v. Piatt Twp., 404 F. App'x 629, 631 (3d Cir. 2010).  This "irrational and wholly arbitrary" standard is difficult for a plaintiff to meet in a zoning dispute.  Village of Willowbrook, 528 U.S. at 565-66, (Breyer, J., concurring).

As an initial matter, the record evidence does not support a finding that Mr. Drumheller acted irrationally or arbitrarily in denying Mr. Pevar's Permit Application.  To the contrary, as previously discussed, the record evidence is clear that Mr. Drumheller acted reasonably in interpreting and applying the zoning ordinance to Mr. Pevar's Permit Application.  Although Mr.

---

[5]     As noted above, the record evidence is clear that Mr. Drumheller's decision to deny Mr. Pevar's Permit Application is the only adverse action against Mr. Pevar implicating either of the Individual Defendants.

Pevar has presented an expert report arguing that the zoning ordinance could have been interpreted differently and that Mr. Drumheller could have reached a different result under that interpretation, that does not mean that a reasonable jury could conclude based on the record evidence that Mr. Drumheller acted irrationally or arbitrarily in rendering his decision.

Additionally, even if the Court were to assume that Mr. Drumheller's decision was based purely on animosity toward Mr. Pevar—an assumption that is not supported by the record evidence—Mr. Pevar is unable to identify other similarly situated individuals who Mr. Drumheller treated differently.  To be "similarly situated," parties must be alike "in all relevant aspects."  Startzell v. City of Philadelphia, 533 F.3d 183, 203 (3d Cir. 2008) (quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)).  Mr. Pevar directs the Court only to two other projects to which he claims his project was similarly situated and which Mr. Drumheller treated differently: the Berlin development and the Mulberry Street development.  However, the Mulberry Street development was approved for construction in August 2000, a full year before Mr. Drumheller began working for the Borough.  Borough Stmt. Facts ¶ 40.  Thus, Mr. Drumheller did not make the decision to approve the Mulberry Street development, and it is therefore an inappropriate comparator.  As for the Berlin development, Mr. Pevar admits that the steep slopes on the Berlin property cover only a small part of the parcel and do not include the area where the townhouses were built.  Id. ¶ 36.  Mr. Pevar also admits that if slopes are only on a small part of the property, they are considered de minimus, and building is permitted on the parcel.  Id. ¶ 37.  Contrary to the Berlin development, it is undisputed that the slopes on the Pevar Property are not de minimus, and Mr. Pevar intended to build on the slopes in question.  Thus, neither of the identified properties is similarly situated to Mr. Pevar's property.

Absent evidence that Mr. Drumheller treated Mr. Pevar differently from similarly situated individuals, Mr. Pevar is unable to satisfy his *prima facie* burden for making out a "class of one" equal protection claim against Mr. Drumheller.  Accordingly, considering the record in the light most favorable to Mr. Pevar, there is insufficient evidence for any reasonable jury to reach a verdict in his favor against either of the Individual Defendants as to this claim.

### D.  <u>Monell</u> Claims Against the Borough

Mr. Pevar has failed to identify any policy, practice, or custom of the Borough, let alone advance sufficient evidence to prove his constitutional rights were violated as a result of a policy or custom.  Mr. Pevar's brief in opposition to Defendants' motion for summary judgment addresses Borough policies, practices or customs only in conclusory fashion, and suggests that he will be able to establish a policy or practice at trial, asserting that the purported "inconsistent and disparate [sic] Defendant Drumheller in dealing with zoning applications and violations," was the Borough's policy that inflicted his constitutional injuries.  Pevar Opp. at 11.  However, this alleged policy is insufficient to maintain his claim because <u>Monell</u> claims are not vehicles for imposing vicarious § 1983 liability on municipalities for the misconduct of their employees.  <u>See</u> <u>Brown</u>, 586 F.3d at 292.

At oral argument and in his supplemental brief, Mr. Pevar suggested that the Borough had a "policy and practice motivated by a desire to discriminate against him for ongoing exercise of his rights to free speech, petitioning of government and political activity in violation of his Constitutional rights."  Pevar Opp. Supp. at 2.  However, Mr. Pevar has not highlighted any particular identifiable policy or practice of the Borough, and has failed to allege any evidence

establishing that the Borough had instituted a policy that operates to discriminate against him.[6]

Likewise, the purported discrimination against Mr. Pevar, and Mr. Pevar alone, is by definition

not a custom, which must be "so widespread as to have the force of law."  Bryan Cty., 520 U.S.

at 404.

 Mr. Pevar has not only failed to meet his burden of establishing an affirmative link

between a policy of the Borough and the alleged constitutional violation, he fails to credibly

show that such a policy even existed.  Because there are no facts in the record of any conduct

under which this Court could impose liability under Monell, summary judgment as to all claims

against the Borough is appropriate.

---

[6] The only purported "evidence" of this policy of discrimination toward Mr. Pevar, is Mr. Pevar's own handwritten notes, in which he wrote, "John Thomas reported that Rose Biondi told him, Rusty [Drumheller] said to him - next time don't go to Marc Pevar. The Boro [sic] doesn't like him.  Go to Dr. Bosely.  He is on commission.  They like him."  Pevar Ex. 38.  At his deposition, Mr. Pevar admitted that he never spoke with Ms. Biondi about her conversation with Mr. Drumheller, and at present, does not know where Ms. Biondi is located.  Pevar Ex. 39. These notes, and Mr. Pevar's testimony regarding the notes are inadmissible hearsay that cannot be used to overcome summary judgment, see Smith v. Allentown, 589 F.3d 684, 693 (3d Cir. 2009), and the Court will refrain from indulging in Mr. Pevar's – what can appropriately be characterized as – game of telephone to determine whether the Borough does or does not in fact "like him."  Federal court simply is not a forum for measuring one's popularity in the community by guessing about who likes who and why and to what effect.

V.      **CONCLUSION**

For the foregoing reasons, the Court grants the Defendants' motion for summary

judgment against Plaintiff Marc Pevar.

An appropriate Order consistent with this Memorandum follows.


BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge